# United States Bankruptcy Appellate Panel
## FOR THE EIGHTH CIRCUIT

_____

No. 12-6043

_____

|   |   |
|---|---|
| In re: | * |
|  | * |
| LGI Energy Solutions, Inc.; LGI Data Solutions Company, LLC, | * |
|  | * |
| Debtors. | * |
| _____ | * |
|  | * Appeal from the United States |
| John R. Stoebner, Trustee, | * Bankruptcy Court for the |
|  | * District of Minnesota |
| Plaintiff – Appellee | * |
|  | * |
| v. | * |
|  | * |
| San Diego Gas & Electric Company, | * |
|  | * |
| Defendant – Appellant | * |

_____

No. 12-6044

_____

|   |   |
|---|---|
| In re: | * |
|  | * |
| LGI Energy Solutions, Inc.; LGI Data Solutions Company, LLC, | * |
|  | * |
| Debtors. | * |
| _____ | * |
|  | * Appeal from the United States |
| John R. Stoebner, Trustee, | * Bankruptcy Court for the |
|  | * District of Minnesota |
| Plaintiff – Appellant | * |

```
                              *
                              *
          v.                  *
                              *
Southern California Edison Company,   *
                              *
      Defendant – Appellee     *
```

_____

Submitted: October 23, 2012
Filed: November 14, 2012

_____

FEDERMAN, VENTERS and SALADINO, Bankruptcy Judges

_____

VENTERS, Bankruptcy Judge.

In these consolidated appeals, Defendants San Diego Gas & Electric Company ("SDG&E") and Southern California Edison Company ("SCE") appeal the bankruptcy court's judgments against them under 11 U.S.C. § 547(b) for payments they received from the Debtors[1] in the 90 days prior to the bankruptcy petition date. After giving credit for certain "new value" transfers, the bankruptcy court entered judgment against SCE for $131,267.63 and against SDG&E for $31,242.63.

The Defendants assign error to three aspects of the bankruptcy court's ruling. They argue: 1) that the transfers at issue weren't preferential because the Defendants weren't creditors of the Debtors, as required by § 547(b)(1); 2) that the transfers were not on account of antecedent debts, as required by § 547(b)(2); and 3) that the bankruptcy court erred in limiting the Defendants' new value credits to

_____

[1] Because the two Debtor's estates have been consolidated, for convenience all references herein will be to the "Debtors," although a particular fact might pertain to a single Debtor.

the value of the utility services they provided to the Debtors' customers in the preference period.

For the reasons stated below, we affirm the bankruptcy court's decision with regard to its determination that the payments the Defendants received from the Debtors are avoidable under 11 U.S.C. § 547(b), but we reverse on the bankruptcy court's calculation of the Defendants' new value credits.

## JURISDICTION

The bankruptcy court's judgment is a final order over which we have jurisdiction under 28 U.S.C. §158(b).

## BACKGROUND

The facts are undisputed. On February 6, 2009, separate involuntary Chapter 7 bankruptcy petitions were filed against the Debtors. An Order for Relief was entered in each case on March 3, 2009, and the Debtors' bankruptcy estates were substantively consolidated on February 2, 2011.

The Debtors' business was to provide utility-management and bill-payment services to restaurants and other businesses. As originally conceived, the Debtors' business worked in the following manner: The Debtors would receive invoices from a utility provider on behalf of a customer and then periodically report to the customer regarding those invoices. The customer then would transfer funds to the Debtors in an amount that corresponded to the amount of the invoice report and, after receiving those funds from the customer, the Debtors would send the utility provider a check drawn on the Debtors' bank account.

All of the transfers at issue in this appeal relate to two of the Debtors' and Defendants' mutual customers: Buffets, Inc. (and related entities) and Wendy's

3

International, Inc.[2] The Debtors provided bill-payment services to Buffets pursuant to an "Energy Services Agreement" dated January 5, 2007. The Debtors and Wendy's were parties to an Energy Services Agreement dated May 1, 2007.

In the 90 days prior to the petition date of February 6, 2009, the Debtors made the following 24 transfers to Defendant SCE totaling $183,512.74:

| Check No. | Check Amt. | Check Date | Rcvd. by SCE | Clear Date |
|---|---|---|---|---|
| 6077932 | $4,178.52 | 10/21/08 | 11/12/08 | 11/14/2008 |
| 6077954 | $4,224.86 | 10/21/08 | 11/12/08 | 11/14/2008 |
| 6076652 | $5,943.93 | 10/17/08 | 11/14/08 | 11/18/2008 |
| 6076653 | $8,125.06 | 10/17/08 | 11/14/08 | 11/17/2008 |
| 6076654 | $9,620.77 | 10/17/08 | 11/14/08 | 11/17/2008 |
| 6076656 | $9,996.85 | 10/17/08 | 11/14/08 | 11/17/2008 |
| 6078508 | $7,948.76 | 10/23/08 | 11/12/08 | 11/14/2008 |
| 6078516 | $8,156.87 | 10/23/08 | 11/12/08 | 11/14/2008 |
| 6078532 | $8,188.20 | 10/23/08 | 11/19/08 | 11/21/2008 |
| 6078537 | $7,827.17 | 10/23/08 | 11/18/08 | 11/20/2008 |
| 6078554 | $7,435.41 | 10/23/08 | 11/18/08 | 11/20/2008 |
| 6078566 | $7,804.13 | 10/23/08 | 11/18/08 | 11/20/2008 |
| 6078617 | $7,678.34 | 10/23/08 | 11/13/08 | 11/17/2008 |
| 6079360 | $7,371.65 | 10/27/08 | 11/13/08 | 11/17/2008 |
| 6079362 | $10,844.50 | 10/27/08 | 11/13/08 | 11/17/2008 |
| 6079363 | $9,514.28 | 10/27/08 | 11/13/08 | 11/17/2008 |
| 6079379 | $7,860.50 | 10/27/08 | 11/17/08 | 11/19/2008 |
| 6079380 | $6,322.93 | 10/27/08 | 11/17/08 | 11/19/2008 |
| 6079381 | $6,628.53 | 10/27/08 | 11/17/08 | 11/19/2008 |
| 6079382 | $7,970.53 | 10/27/08 | 11/17/08 | 11/19/2008 |
| 6079943 | $8,460.80 | 10/28/08 | 11/12/08 | 11/14/2008 |
| 6080543 | $6,881.98 | 10/29/08 | 11/17/08 | 11/19/2008 |
| 6080554 | $7,461.95 | 10/29/08 | 11/25/08 | 11/28/2008 |
| 6080946 | $7,066.22 | 10/30/08 | 11/20/08 | 11/24/2008 |

---

[2] Only SCE provided utility service to Wendy's.

All 24 of the transfers were made by checks drawn on a checking account at U.S. Bank in the name of debtor LGI Energy Solutions, Inc., account no. xxxx-3321. The first two checks, nos. 6077932 and 607954, totaling $8,403.38, related to Wendy's; the other 22 checks related to Buffets.

In the 90 days prior to the petition date of February 6, 2009, the Debtors made eight transfers to Defendant SDG&E totaling $75,053.85. All eight of the transfers were made by checks drawn upon account no. 3321 and related to utility services provided to Buffets.

| Check No. | Check Amt. | Check Date | Rcvd by SDG&E | Clear Date |
|---|---|---|---|---|
| 6075058 | $5,773.59 | 10/13/08 | 11/12/08 | 11/14/08 |
| 6078518 | $10,402.58 | 10/23/08 | 11/12/08 | 11/17/08 |
| 6078952 | $9,093.92 | 10/24/08 | 11/18/08 | 11/20/08 |
| 6079349 | $10,468.59 | 10/27/08 | 11/10/08 | 11/12/08 |
| 6079949 | $8,514.01 | 10/28/08 | 11/20/08 | 11/24/08 |
| 6080548 | $11,097.37 | 10/29/08 | 11/17/08 | 11/19/08 |
| 6081120 | $10,062.69 | 10/31/08 | 11/25/08 | 11/26/08 |
| 6081126 | $9,641.10 | 10/31/08 | 11/26/08 | 11/28/08 |

The 3321 account was a basic, unrestricted business checking account. Both the monthly statements for the 3321 account and the checks drawn on the 3321 account indicate that LGI Energy Solutions, Inc. was the sole holder of the account. Wendy's and Buffets last made deposits into the 3321 account on November 3, 2008, and November 4, 2008, respectively. Thereafter, Wendy's and Buffets made their payments to the debtors via other accounts owned by the Debtors at M & I Marshall & Ilsley Bank. Between November 3, 2008, when Wendy's made its last deposit into the 3321 account, and November 28, 2008, when the last of the 24 checks was debited against the 3321 account, the balance of the 3321 account was overdrawn or drawn to a nominal amount every business day.

On and after November 10, 2008, through the petition date, SCE sent 32 Wendy's invoices to the Debtors, which they then reported to Wendy's. Wendy's remitted payment for these invoices, but the Debtors never paid the related invoices of SCE. The Debtors received a total of $41,426.39 pursuant to these invoices.

On and after November 10, 2008, through the petition date, Defendant SCE sent 32 Buffets invoices to the Debtors, which they then reported to Buffets. Buffets remitted payment to the Debtors for these invoices, but the Debtors never forwarded those payments on to SCE. The Debtors received a total of $157,886.99 pursuant to these invoices.

On and after November 10, 2008, through the petition date, Defendant SDG&E sent 21 Buffets invoices to the Debtors, which they then reported to Buffets. Buffets remitted payment for these invoices, but the Debtors never forwarded those payments on to SDG&E. The Debtors received a total of $97,475.50 pursuant to these invoices.

The bankruptcy court held a hearing on the Trustee's preference claims (Count I)[3] against Defendants on June 11, 2012, although the court declined to hear oral argument; it took the case on written submissions instead and entered judgments later that day – against SCE for $131,267.63 and against SDG&E for $31,242.63.

The Defendants timely appealed.

---

[3] On May 3, 2012, the Defendants filed motions for summary judgment seeking the dismissal of all counts (I, II, and III) of the Amended Complaint(s). The Trustee voluntarily dismissed Counts II and III, and the bankruptcy court denied summary judgment on Count I.

## STANDARD OF REVIEW

We review the bankruptcy court's legal conclusions *de novo* and its findings of fact under a clearly erroneous standard.[4] A finding is clearly erroneous when there is evidence to support it but the court reviewing the entire evidence is left with the definite and firm conviction that a mistake has been committed.[5] Whether the Defendants were creditors of the Debtor and whether the transfers were made in payment of antecedent debts are factual questions which we review for clear error. The bankruptcy court's application of § 547(c)(4) is a mixed question of law and fact.

## DISCUSSION

As summarized above, the Defendants appeal three aspects of the bankruptcy court's ruling. They argue: 1) that the Defendants weren't creditors of the Debtors, 2) that the transfers were not on account of antecedent debts, and 3) that the bankruptcy court miscalculated the value of the Defendants' new value credits. Each argument is addressed in turn.

## A.    The Defendants were creditors of the Debtors

The Bankruptcy Code defines "creditor" as an "entity that has a claim against a debtor that arose at the time of or before the order for relief concerning the debtor."[6] A "claim," in turn, is defined as a:

> (A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or;

---

[4] *See Drewes v. Vote* (*In re Vote*), 276 F.3d 1024, 1026 (8th Cir. 2002).
[5] *See Lovett v. St. Johnsbury Trucking*, 931 F.2d 494, 500 (8th Cir. 1991).
[6] 11 U.S.C. §101(10).

(B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduce to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.[7]

The bankruptcy court held that the Defendants were creditors of the Debtors on two grounds. It found that the Defendants were beneficiaries of a trust created between the Debtors and their customers and that the Defendants became creditors when the Debtors violated the trust by depleting the customer deposits without paying the Defendants' invoices. Alternatively, the bankruptcy court found that the Defendants were contractual "third-party beneficiaries" with direct claims against the Debtors. Neither of these findings is clearly erroneous.

## 1.    Trust Beneficiary Claims

Minnesota law requires three elements for the creation of a trust: (1) a trustee; (2) a beneficiary; and (3) a definite trust *res*.[8] "No particular form and no specific words are necessary to create a trust. Even though the settlor's language be inept, clumsy, or even unsuitable, it is adequate if it reveals an intent to create the incidence of a trust relationship."[9]

The Debtors' agreements with Wendy's and Buffets both evince an intent to create a trust. Paragraph 3b of the agreement between the Debtors and Buffets provides that Buffets will provide money to the Debtors to be used for the specific purpose of paying the bills of utility companies and states that "[a]t no time shall LGI have a legal or equitable interest in the Customers funds and Customer grants no security interest to LGI."[10] The Debtors' agreement with Wendy's provides that

---

[7] 11 U.S.C. § 101(5).
[8] *See e.g., In re Bush's Trust*, 81 N.W.2d 615, 620 (Minn. 1957).
[9] *Id*. at 619-20.
[10] Technically, this language would not create a trust, inasmuch as the trustee of a trust holds legal title to the *res* while the beneficiaries hold an equitable interest in the res. *See Farmers State Bank of Fosston v. SIG Ellingson & Co.*, 16 N.W. 2d

the funds tendered to the Debtors are to be used for the specific purpose of paying Wendy's utility bills.

The Debtors' and Buffets' intent to create the "incidence of a trust" is further evidenced by the state-court complaint attached to Buffets' proof of claim, which repeatedly invokes trust language:

- "As a result, [the Debtor] held Plaintiff Buffets' funds in trust…." (¶ 3)

- "Defendant M & I Marshall & Ilsley Bank knew [the Debtor] did not have any ownership interest in Plaintiff Buffets' funds and that [the Debtor] held Plaintiff Buffets' funds in trust subject to fiduciary duties." (¶ 4)

- "The Contract provided that [the Debtor] would directly receive the utility invoices ….to wire transfer or ACH transfer this gross amount to a bank account [Debtor] designated where Plaintiff Buffets' monies were held in trust for the payment of utility invoices….." (¶ 30)

Having determined that a trust was created, the bankruptcy court held that the Debtors' dissipation of the trust *res*, *i.e.*, the customer deposits, constituted a breach of the trust, giving the Defendants general, unsecured claims against the Debtors for the amounts the Debtors failed to forward to them pursuant to the Energy Services Agreements.

The Sixth Circuit Court of Appeals, in *First Federal of Michigan v. Barrow*,[11] came to the same conclusion under analogous circumstances. In *First Federal*, a mortgage broker and servicer of mortgages received payments from borrowers and, despite being contractually bound to forward those payments

---

319, 322 (N.D. 1944). Nevertheless, this language could be interpreted as evidence of the parties' intent to preclude the Debtors from treating customer funds as their own money, which in turn could be interpreted as an intent to create a trust, albeit clumsily expressed.

[11] 878 F.2d 912, 917-918 (6th Cir. 1989).

(minus its fees) to the investors, taxing authorities, insurers, etc., it dissipated the payments almost immediately upon receipt and made select payments to certain creditors with later deposits. The Court of Appeals analyzed the situation as follows:

> Initially, the monthly payments collected in trust from the mortgagors, including the pro rata amounts for the superior mortgages, taxes, hazard insurance and investors which had originally been held in trust for the mortgagors . . . and which were deposited into the Salem Central Account, subsequently lost their identity as a result of commingling with other unidentified debtor funds derived from numerous other miscellaneous sources and became the property of the debtors' estate.
>
> Additionally, for at least ninety days immediately preceding debtors' declaration of bankruptcy and probably for some time prior thereto when it became apparent that debtors' exploding expenses hopelessly exceeded income and the Salem Central Account consistently carried a five figure negative balance, and when monies from that account were disbursed to honor previously issued checks in satisfaction of pre-existing indebtedness, <u>the mortgagors as well as the appellant taxing authorities and investors were stripped of their status as beneficiaries of any trust or constructive trust that may have existed while the mortgage payments were identifiable in segregated escrow accounts and they became general creditors of the debtors</u> and the debtors' bankrupt estate because the debtors' conversion of the mortgage payments had occurred at the moment when the identifiable funds were deposited into Salem's negative balance Central Account from which transfers were made to satisfy debtors' pre-existing indebtedness to the mortgagors and appellants. Accordingly, the appellants' charge that the transfers here in controversy were not in payment of pre-existing indebtedness must fail and the repayments to the appellants must be declared to be voidable preferences.[12]

---

[12] *Id. (emphasis added).*

10

Like the appellants in *First Federal*, the Defendants here became general, unsecured creditors of the Debtors at the moment the Debtors depleted the customer deposits, which the evidence shows happened on a daily basis and, most importantly, before the Debtors used those deposits for their intended purpose.

In sum, consistent with the intent to create a trust, Wendy's and Buffets entrusted the Debtors with specific, identifiable property that they were to hold in trust for payment to the Defendants and other utility companies. The Debtors' failure to preserve trust property was a breach of trust which gave the Defendants unsecured claims against the Debtors. Thus, the bankruptcy court's holding that the Defendants were creditors of the Debtors for purposes of § 547(b)(1) is not clearly erroneous.

### 2. Third-Party Beneficiary Claims

"It is the prevailing rule in Minnesota and other jurisdictions in the United States that a third party may sue on a contract made for his direct benefit."[13] "If, by the terms of the contract, performance is directly rendered to a third party, he is intended by the promisee to be benefited." And where a promisor agrees to pay the debts of another – as was the case here – the intended third-party beneficiary possesses the primary claim against the promisor for the debt.[14]

At oral argument, the Defendants conceded that SDG&E and SCE were third-party beneficiaries with regard to the transfers received on account of the utility services provided to Buffets. They continue to maintain, however, that the language in the Energy Services Agreement with Wendy's precludes a claim by

---

[13] *Buchman Plumbing Co., Inc. v. Regents of the Univ. of Minnesota*, 215 N.W.2d 479, 483 (Minn. 1974).
[14] *In re Maurer*, 256 B.R. 495, 502 (B.A.P. 8th Cir. 2000).

the Defendants as third-party beneficiaries.[15] Specifically, they point to the provision in the Agreement stating that LGI "shall [not] be required to incur any liability in connection therewith." The bankruptcy court rejected this interpretation of the Energy Services Agreement. That finding is not clearly erroneous.

First, the context of the quoted passage suggests that it was intended only to reinforce the parties' agreement that LGI had no duty to extend credit, *i.e.*, pay a utility bill for which Wendy's had not yet forwarded payment.  To wit, page 7 of the agreement provides in larger part:

> LGI shall then be obligated to pay each utility invoice within two business days of receipt of Wendy's ACH transfer. LGI shall in no event be required to advance any of its funds or to utilize LGI's credit in connection with or on behalf of Wendy's, *nor shall LGI be required to incur any liability in connection therewith*. Wendy's shall indemnify and hold harmless LGI from and against any and all claims, liabilities, costs and expenses relating to utility invoices that have been processed in accordance with this Agreement.[16]

Second, the italicized portion can be interpreted as establishing LGI's receipt of funds from Wendy's as a condition precedent to LGI's obligation to pay utility providers.

Finally, the Energy Services Agreement's statement that LGI was not *required* to incur any liability does nothing to actually prevent LGI from incurring

---

[15] Minnesota follows the Restatement (Second) of Contracts, s*ee Cretex Companies, Inc. v. Constr. Leaders, Inc.*, 342 N.W.2d 135, 139 (Minn. 1984), which permits a promisor and promise to contractually restrict (or eliminate) the rights of a third-party beneficiary. "(1) *Unless otherwise agreed between promisor and promisee*, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties. . . ."  Restatement (Second) of Contracts § 302.

[16] Emphasis added.

a debt to a utility company as a result of its breach of the agreement by, for example, using the funds it received from Wendy's for another purpose. This interpretation would be more consistent with the subsequent sentence which specifically contemplates potential claims against LGI by the utilities.

For these reasons, we hold that the bankruptcy court's finding that the Defendants were creditors of the Debtors as a consequence of their status as third-party beneficiaries of the Energy Services Agreements is not clearly erroneous.

## B. The preferential transfers to the Defendants were made in payment of antecedent debts as required by 11 U.S.C. § 547(b)(2)

The Defendants argue that the transfers at issue were not preferences because they weren't made in payment of antecedent debts. According to the Defendants, the Debtors would not actually owe a debt to the Defendants until the Debtors breached their agreements with Buffets and Wendy's by failing to make timely payments to the Defendants. Essentially, they argue that a debt created by contract does not arise until the promisor repudiates or breaches the contract. They point to the Eighth Circuit case, *In re Bridge Information System, Inc.*,[17] to support their argument.

The Defendants' argument on this point is without merit and their reliance on *In re Bridge Information Systems, Inc.* is misplaced.

The Bankruptcy Code does not define when the debtor incurs a debt, but it does define a "debt" as a liability on a claim.[18] Thus, the concept of a debt and a claim are coextensive under the Code,[19] and a debtor incurs a debt to a creditor for purposes of § 547(b)(2) as soon as the creditor would have had a claim against the

---

[17] 327 B.R. 382 (B.A.P. 8th Cir. 2005), *aff'd* 474 F.3d 1063 (8th Cir. 2007)

[18] 11 U.S.C. § 101(12).

[19] *See In re Energy Co-op. Inc.*, 832 F.2d 997, 1001 (7th Cir. 1987) ("By defining a debt as a 'liability on a claim,' Congress gave debt the same broad meaning it gave claim.").

debtor's estate. The Defendants here had a claim against the Debtors when the Debtors received funds from Buffets and Wendy's.

The rights and duties of a third-party beneficiary contract "depend upon, and are measured by, the terms of the contract." Under the Buffets Energy Services Agreement, the Debtors were obligated to the "timely payment of invoices" upon receipt of the customer funds. Under the Agreement with Wendy's, the Debtors were required to "pay each utility invoice within two business days of receipt of Wendy's ACH transfer."

The fact that the Debtors had a time within which to perform their obligations before they would be in breach of the contract does not mean that the obligation did not arise until those deadlines were upon them or past, just as the prepayment of a loan before an installment due date or the maturity date constitutes payment on an antecedent debt.[20] The key to determining whether a transfer "for or on account of" a debt owed by a debtor is whether a creditor would be able to assert a claim against the estate absent payment. Here, the Defendants (or the customers, as the primary promisees) had (and, indeed, did file) claims for all the funds paid by a customer that were not paid to the Defendants for utility services when the involuntary bankruptcy petitions were filed against the Debtors.

Furthermore, *Bridge Information Systems, Inc.,* does not stand for the proposition the Defendants attribute to it, *i.e.*, that a contractual duty to pay does not arise until a party is in breach of that duty. Rather, the question in that case was whether a payment pursuant to a settlement agreement was in payment of the lessor's alleged prior breach of a lease or a contemporaneous "buy out" of the lessee's renewal options.[21] If the payment made by the debtor-lessor was in satisfaction of damages caused by its purported prior breach – as the bankruptcy

---

[20] *See, e.g., In re Bennett Funding Group, Inc.*, 220 B.R. 739 (B.A.P. 2nd Cir. 1998).
[21] *In re Bridge Information Systems, Inc.*, 327 B.R. at 387-89.

court held – then the payment would have been in satisfaction of an antecedent debt and, therefore, avoidable as a preference. However, if the transfer was payment for the defendant-lessee's option rights – as the Bankruptcy Appellate Panel held – then the transfer was not in payment of an antecedent debt and not a preference. Quite simply, the holding of *Bridge Information Systems, Inc.*, is inapposite here.

For these reasons, we conclude that the bankruptcy court did not err in its determination that the transfers at issue here were made in payment of antecedent debts for purposes of 11 U.S.C. § 547(b)(2).

## C.    The Defendants' new value credit was improperly determined

Section 547(c)(4) of the Bankruptcy Code provides:

The trustee may not avoid under this section a transfer –

(4) to or for the benefit of a creditor, to the extent that, after such transfer, *such creditor* gave new value to or for the benefit of the debtor —
(A) not secured by an otherwise unavoidable security interest; and
(B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor. . . ."

"New value" is defined as "money or money's worth in goods, services, or new credit . . . including proceeds of such property." 11 U.S.C.§ 547(a)(2).

The bankruptcy court held that the plain language of § 547(c)(4) – specifically, its reference to "such creditor" – requires that new value be supplied by the creditor that received the preferential transfer. Accordingly, it limited the

Defendants' new value credit to the value of the utility services they provided to Buffets and Wendy's during the preference period.

The Defendants contend that under the Eighth Circuit Court of Appeals case, *Jones Truck Lines, Inc. v. Central States, Southeast and Southwest Areas Pension Fund* (*In re Jones Truck Lines, Inc.*),[22] the Defendants' new value credit should not be limited to the value of the utility services provided to the Wendy's and Buffets customers during the preference period. Rather, they argue, they are entitled to a credit for all of the payments Wendy's and Buffets made to the Debtors subsequent to each transfer, regardless of when the utility services were provided. We concur with the Defendants' interpretation of the holding in *Jones Truck Lines.*

In *Jones Truck Lines*, a Chapter 11 debtor-employer sued to recover, as preferential transfers, payments to a "Health and Welfare Fund" and to a "Pension Fund" made on behalf of its employees.[23] The bankruptcy court and district court held that under § 547(c)(4), the defendant-Funds could not offset their preference liability with the value provided by the debtor's employees (in the form of continued services rendered to the debtor); rather, the Funds themselves had to provide new value to the debtor.[24] In reversing the lower courts' decisions, the Court of Appeals examined the parties' tripartite relationship and held that the employee services provided to the debtor during the preference period qualified as new value which could be applied as an offset against the Funds' preference liability.[25] Notably, the Court of Appeals found that the Funds were creditors of the debtor in their own right but did not limit the Funds' new value credit to any value they provided to the current employees. And, as a practical matter, it is unlikely that the current employees received any contemporaneous benefit from the Pension

---

[22] 130 F.3d 323 (8th Cir. 1997).

[23] *Id*. at 325-36.

[24] *Id; In re Jones Truck Lines, Inc.*, 196 B.R. 483, 492 (Bankr. W.D. Ark. 1995.)

[25] *In re Jones Truck Lines, Inc.*, 130 F.3d at 328-29.

Fund. Hence, the bankruptcy court's calculation of new value in this case is not consistent with the Eighth Circuit's binding holding in *Jones Truck Lines*.

Arguably, because the Defendants were found to be creditors in their own right, as opposed to just transferees of payments that benefitted a creditor (Wendy's or Buffets), the holding of *Jones Truck Lines* would appear to be contrary to the plain terms of § 547(c)(4), which requires "such creditor," *i.e.*, the creditor that received the transfer (or the benefit of the transfer) to provide the new value. However, the holding in *Jones Truck Lines* can be harmonized with the statute by interpreting it as a recognition that in tripartite relationships where the transfer to a third party benefits the primary creditor, new value can come from that creditor, even if the third party is a creditor in its own right. And that is exactly the nature of the tripartite relationship here. In fact, as trust beneficiaries and third-party beneficiaries, the Defendants are creditors of the Debtors precisely because the payments made to them were intended to benefit the creditor(s) that provided the new value (*i.e.*, the Debtors' customers, Wendy's and Buffets).

Giving the Defendants credit for all of the payments Wendy's and Buffets made to the Debtors on account of utility services provided by the Defendants, SDG&E's liability is reduced to zero and SCE's liability is reduced to $25,625.75. The charts below show the calculation of the Defendants' new value credits based on the figures contained in the record.[26]

### SCE – WENDY'S NEW VALUE ANALYSIS

| Transfer Date | Preferential Transfer | Transfer to Debtor | Net Preference | Comment |
|---|---|---|---|---|
| 11/14/2008 | $4,178.52 | | $4,178.52 | |
| 11/14/2008 | $4,224.86 | | $8,403.38 | |
| 11/20/2008 | | $40.00 | $8,363.38 | |

---

[26] All of these figures are contained in the Stipulations of Fact filed in the underlying bankruptcy court cases, *Stoebner v. SCE*, 11-4066 (Doc. 39) and *Stoebner v. SDG&E*, 11-4065 (Doc. 38).

| Transfer Date | Preferential Transfer | Transfer to Debtor | Net Preference | Comment |
|---|---|---|---|---|
| 11/20/2008 | | $2,447.73 | $5,915.65 | |
| 11/20/2008 | | $40.00 | $5,875.65 | |
| 11/20/2008 | | $2,647.66 | $3,227.99 | |
| 11/21/2008 | | $40.00 | $3,187.99 | |
| 11/21/2008 | | $2,604.31 | $583.68 | |
| 11/25/2008 | | $40.00 | $543.68 | |
| 11/25/2008 | | $2,848.46 | ($2,304.78) | **Preference Liability Eliminated** |

## SCE – BUFFETS NEW VALUE ANALYSIS

| Transfer Date | Preferential Transfer | Transfer to Debtor | Net Preference | Comment |
|---|---|---|---|---|
| 11/14/2008 | $4,178.52 | | $4,178.52 | |
| 11/14/2008 | $4,224.86 | | $8,403.38 | |
| 11/14/2008 | $7,948.76 | | $16,352.14 | |
| 11/14/2008 | $8,156.87 | | $24,509.01 | |
| 11/14/2008 | $8,460.80 | | $32,969.81 | |
| 11/14/2008 | | $7,003.12 | $25,966.69 | |
| 11/14/2008 | | $138.53 | $25,828.16 | |
| 11/17/2008 | $8,125.06 | | $33,953.22 | |
| 11/17/2008 | $9,620.77 | | $43,573.99 | |
| 11/17/2008 | $9,996.85 | | $53,570.84 | |
| 11/17/2008 | $7,678.34 | | $61,249.18 | |
| 11/17/2008 | $7,371.65 | | $68,620.83 | |
| 11/17/2008 | $10,844.50 | | $79,465.33 | |
| 11/17/2008 | $9,514.28 | | $88,979.61 | |
| 11/18/2008 | $5,943.93 | | $94,923.54 | |
| 11/19/2008 | | $6,114.90 | $88,808.64 | |
| 11/19/2008 | | $864.00 | $87,944.64 | |
| 11/19/2008 | | $960.11 | $86,984.53 | |
| 11/19/2008 | | $4,832.03 | $82,152.50 | |
| 11/19/2008 | | $4,570.59 | $77,581.91 | |
| 11/19/2008 | | $7,033.00 | $70,548.91 | |
| 11/19/2008 | | $6,168.70 | $64,380.21 | |
| 11/19/2008 | | $5,294.10 | $59,086.11 | |
| 11/19/2008 | | $5,253.98 | $53,832.13 | |
| 11/19/2008 | $7,860.50 | | $61,692.63 | |
| 11/19/2008 | $6,322.93 | | $68,015.56 | |
| 11/19/2008 | $6,628.53 | | $74,644.09 | |
| 11/19/2008 | $7,970.53 | | $82,614.62 | |
| 11/19/2008 | $6,881.98 | | $89,496.60 | |

| Transfer Date | Preferential Transfer | Transfer to Debtor | Net Preference | Comment |
|---|---|---|---|---|
| 11/20/2008 | | $21.30 | $89,475.30 | |
| 11/20/2008 | | $5,283.78 | $84,191.52 | |
| 11/20/2008 | | $5,410.79 | $78,780.73 | |
| 11/20/2008 | | $5,728.54 | $73,052.19 | |
| 11/20/2008 | | $5,280.57 | $67,771.62 | |
| 11/20/2008 | | $6,118.07 | $61,653.55 | |
| 11/20/2008 | $7,827.17 | | $69,480.72 | |
| 11/20/2008 | $7,435.41 | | $76,916.13 | |
| 11/20/2008 | $7,804.13 | | $84,720.26 | |
| 11/21/2008 | $8,188.20 | | $92,908.46 | |
| 11/24/2008 | $7,066.22 | | $99,974.68 | |
| 11/28/2008 | | $5,470.19 | $94,504.49 | |
| 11/28/2008 | | $5,058.94 | $89,445.55 | |
| 11/28/2008 | | $7,803.90 | $81,641.65 | |
| 11/28/2008 | | $6,438.30 | $75,203.35 | |
| 11/28/2008 | | $4,826.31 | $70,377.04 | |
| 11/28/2008 | $7,461.95 | | $77,838.99 | |
| 12/1/2008 | | $71.29 | $77,767.70 | |
| 12/1/2008 | | $5,256.98 | $72,510.72 | |
| 12/1/2008 | | $6,067.03 | $66,443.69 | |
| 12/1/2008 | | $4,771.92 | $61,671.77 | |
| 12/1/2008 | | $6,218.99 | $55,452.78 | |
| 12/1/2008 | | $5,148.72 | $50,304.06 | |
| 12/9/2008 | | $6,107.77 | $44,196.29 | |
| 12/9/2008 | | $5,577.87 | $38,618.42 | |
| 12/9/2008 | | $6,892.98 | $31,725.44 | |
| 12/9/2008 | | $6,099.69 | **$25,625.75** | **Preference Liability** |

## SDG&E – BUFFETS NEW VALUE ANALYSIS

| Transfer Date | Preferential Transfer | Transfer to Debtor | Net Preference | Comment |
|---|---|---|---|---|
| 11/12/2008 | $10,468.59 | | $10,468.59 | |
| 11/13/2008 | | $3,126.29 | $7,342.30 | |
| 11/13/2008 | | $1,747.28 | $5,595.02 | |
| 11/13/2008 | | $5,255.58 | $339.44 | |
| 11/13/2008 | | $7,208.34 | ($6,868.90) | New Value credit does not carry forward. |
| 11/13/2008 | | $2,167.03 | $0.00 | |
| 11/14/2008 | $5,773.59 | | $5,773.59 | |

| Transfer Date | Preferential Transfer | Transfer to Debtor | Net Preference | Comment |
|---|---|---|---|---|
| 11/17/2008 | $10,402.58 | | $16,176.17 | |
| 11/19/2008 | $11,097.37 | | $27,273.54 | |
| 11/20/2008 | | $7,487.70 | $19,785.84 | |
| 11/20/2008 | | $2,328.80 | $17,457.04 | |
| 11/20/2008 | $9,093.92 | | $26,550.96 | |
| 11/24/2008 | $8,514.01 | | $35,064.97 | |
| 11/25/2008 | | $8,195.65 | $26,869.32 | |
| 11/25/2008 | | $1,855.14 | $25,014.18 | |
| 11/26/2008 | $10,062.69 | | $35,076.87 | |
| 11/28/2008 | | $8,254.95 | $26,821.92 | |
| 11/28/2008 | | $1,955.21 | $24,866.71 | |
| 11/28/2008 | $9,641.10 | | $34,507.81 | |
| 12/1/2008 | | $1,667.01 | $32,840.80 | |
| 12/1/2008 | | $8,236.52 | $24,604.28 | |
| 12/1/2008 | | $7,942.75 | $16,661.53 | |
| 12/1/2008 | | $2,055.03 | $14,606.50 | |
| 12/5/2008 | | $7,509.62 | $7,096.88 | |
| 12/5/2008 | | $1,788.17 | $5,308.71 | |
| 12/5/2008 | | $1,609.64 | $3,699.07 | |
| 12/5/2008 | | $7,454.17 | ($3,755.10) | **Preference Liability Extinguished** |
| 12/5/2008 | | $7,880.45 | ($11,635.55) | |
| 12/5/2008 | | $1,750.17 | ($13,385.72) | |

## CONCLUSION

For the foregoing reasons, the portion of the bankruptcy court's judgment determining that the Defendants received preferential transfers is affirmed. The court's calculation of the Defendants' new value credit, however, is reversed. SCE is entitled to a new value credit for all but $25,625.75 of the transfers it received and SDG&E is entitled to a new value credit to the full extent of the transfers it received.

_____